IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang

Civil Action No. 24-cv-01692-NYW-SBP

HPM, INC.,

    Plaintiff,

v.

M.C. DEAN, INC.,

    Defendant.

## ORDER ON MOTION TO DISMISS THIRD AMENDED COMPLAINT

This matter comes before the Court on Defendant M.C. Dean, Inc.'s Motion to Dismiss ("Motion to Dismiss" or "Motion"). [Doc. 49, filed April 14, 2025]. Defendant M.C. Dean, Inc. ("Defendant" or "MCD") brings the Motion pursuant to Federal Rule of Civil Procedure 12(b)(6). [*Id.* at 1]. Plaintiff HPM, Inc. ("Plaintiff" or "HPM") opposed the Motion to Dismiss, [Doc. 50], and MCD replied, [Doc. 51]. The Court finds that oral argument would not materially assist in the disposition of the Motion to Dismiss. Upon review of the Parties' briefing, the entire docket, and the applicable case law, the Motion to Dismiss is respectfully **GRANTED in part** and **DENIED in part**.

## BACKGROUND

The following facts are drawn from the operative Third Amended Complaint ("TAC"), [Doc. 47], and the Court accepts them as true for purposes of the Motion. In 2021, MCD was awarded a contract (the "Prime Contract") with the U.S. Army Corps of Engineers (the "Government") to perform construction services for the Buckley Air / Space Force Base located in Colorado (the "Project"). [*Id.* at ¶¶ 2, 9–10]. MCD then sub-

contracted much of the non-electrical construction work required for the Project to HPM, pursuant to a Firm Fixed Price Completion Subcontract (the "Subcontract"). [*Id.* at ¶¶ 1, 11; Doc. 47-1]. After the Subcontract was executed, MCD and the Government modified the design of certain electrical equipment that needed to be installed for the Project, which in turn resulted in changes to the design for underground utilities and related improvements that HPM was building. [Doc. 47 at ¶¶ 22–25]. These design changes increased HPM's expenses and caused a significant delay in HPM's work on the Project. [*Id.* at ¶ 26]. Accordingly, on January 30, 2023, HPM submitted to MCD a proposed change order (the "R10 Proposal") seeking $5,493,861 of additional compensation and 331 additional days of compensable time. [*Id.* at ¶ 27].

In or around April 2023, representatives from each of the Parties and the Government met to discuss the R10 Proposal in person. [*Id.* at ¶ 28]. HPM alleges that after that meeting, MCD engaged in further negotiations with the Government regarding the R10 Proposal without HPM, proposing a reduced amount of compensation and time for the design changes. [*Id.* at ¶¶ 29–30, 32]. HPM was not informed about the results of these negotiations until about May 9, 2023. [*Id.* at ¶ 35]. This is when HPM learned that the Government granted a fraction of what HPM requested in the R10 Proposal, agreeing to only $1,264,099 in compensation, 65 days of compensable delay, and 131 days of non-compensable delay. [*Id.* at ¶¶ 33–34]. MCD did not explain to HPM why it engaged in negotiations with the Government without HPM's involvement or why it made unauthorized reductions and changes to the R10 Proposal. [*Id.* at ¶ 35].

The proposal that the Government authorized was memorialized in a "Subcontract Agreement Modification" (the "Modification"), which MCD electronically submitted to HPM

2

via MCD's web-based portal.  [*Id.* at ¶ 36; Doc. 47-2].  MCD's portal did not provide any way for HPM to edit the Modification.  [Doc. 47 at ¶ 37].  HPM took issue with the Modification and voiced its objections to MCD.  [*Id.* at ¶ 39].  But MCD refused to pay even the reduced amount that the Government authorized unless and until HPM approved the Modification via MCD's portal.  [*Id.*].

At this time, HPM was experiencing financial hardship "due to the significant costs and delays caused by MCD on the Project, MCD's refusal to remit payment, and HPM's limited resources as a small business."  [*Id.* at ¶ 40].  HPM needed to receive at least some additional payment from MCD to continue its work on the Project.  [*Id.* at ¶ 41].  So, on May 19, 2023, HPM sent MCD a protest letter stating that it would "execute the RFP 10 / part two change order under protest, subject to a reservation of all rights to seek additional time and compensation for costs and delays related to RFP10 not approved by the government."  [*Id.* at ¶¶ 41–44; Doc. 47-3].  The letter also explained that HPM's objection is to "the value of the proposed modification and the revision to the contract period of performance resulting from [MCD]'s 'negotiations'" and that "[t]o the extent the government is not responsible for [the additional] costs and delays, HPM intends to look to [MCD] for compensation."  [Doc. 47 at ¶ 43; Doc. 47-3 at 3].

HPM then signed the Modification, as submitted by MCD on its portal, on June 15, 2023.  [Doc. 47 at ¶ 45; Doc. 47-2 at 15].  MCD countersigned on June 16, 2023.  [Doc. 47-2 at 15].  The Modification is a 14-page document containing a description of the changes, a Statement of Work, a "description of work" with line-item breakdowns of the new costs, a list of contracts between the Parties (the Subcontract and five modifications), an attachment with unfilled fields called "Release of Liens," an attachment with unfilled

3

fields called "Schedule of Subcontractors and Suppliers," additional terms and conditions, and a signature page. *See generally* [Doc. 47-2; Doc. 47 at ¶ 36].

HPM originally brought this suit in June of 2024, *see* [Doc. 1], and has amended its Complaint three times, mostly recently in March of 2025, *see* [Doc. 6; Doc. 35; Doc. 47]. In the TAC, HPM alleges that "MCD has failed and refused to pay HPM for the added costs, proposed change orders, insurance claims, and increased subcontractor costs HPM has incurred or will incur related to the Project." [Doc. 47 at ¶ 63]. HPM further alleges that this refusal to pay "constitutes a material breach of the parties' Subcontract" and has resulted in HPM "incurr[ing] millions of dollars in damages." [*Id.* at ¶¶ 64–65]. HPM brings two claims for relief: (1) breach of contract, which includes allegations of four separate breaches of the Subcontract ("Count I"), and (2) breach of the covenant of good faith and fair dealing, for improperly denying HPM's proposed changed orders ("Count II"). [*Id.* at ¶¶ 66–80].

MCD's Motion seeks dismissal of all claims. [Doc. 49 at 2]. MCD first asserts that the entire TAC should be dismissed with prejudice "because HPM released any claims it possessed against MCD arising from the subcontract." [*Id.*]. Alternatively, MCD argues that the breach of contract claim should be dismissed in part "because the provisions cited and the facts alleged do not adequately plead breach of the Subcontract." [*Id.*]. MCD also argues that the breach of the covenant of good faith and fair dealing claim should be dismissed with prejudice for "not adequately alleg[ing] that MCD's denial of the change order was dishonest or outside the scope of commercially accepted practices." [*Id.*].

4

**LEGAL STANDARD**

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding a motion under Rule 12(b)(6), the Court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to the plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). "Exhibits attached to a complaint are properly treated as part of the pleadings for purposes of ruling on a motion to dismiss," *Barnett v. Surefire Med., Inc.*, 342 F. Supp. 3d 1167, 1169 n.2 (D. Colo. 2018) (quoting *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006)), and any "[f]actual allegations that contradict a properly considered document are not well-pleaded facts that the court must accept as true," *Farrell-Cooper Min. Co. v. U.S. Dep't of the Interior*, 728. F.3d 1229, 1237 n.6 (10th Cir. 2013) (cleaned up).

A plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted). The Court must ultimately "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed." *Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007).

## ANALYSIS

**I.  Waiver**

"[O]n occasion it is proper to dismiss a claim on the pleadings based on an affirmative defense."  *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).  "But that is only when the complaint itself admits all the elements of the affirmative defense by alleging the factual basis for those elements."  *Id.* (citing *Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965) ("If the defense appears plainly on the face of the complaint itself, the motion [to dismiss for failure to state a claim] may be disposed of under [Rule 12(b)].")).

MCD argues that the TAC alleges the elements of the affirmative defense of waiver.  [Doc. 49 at 4–5].  Specifically, MCD contends that HPM's allegations that (1) there was a Modification which contained a "Release of Liens" form and (2) HPM signed the Modification "admit[] all the elements of the affirmative defense of waiver."  [*Id.* at 5 (citing Doc. 47 at ¶¶ 38, 45)].  According to MCD, by signing the Modification, HPM released "any claims HPM possessed against MCD arising from the Subcontract."  [*Id.* at 4].  Because "HPM alleges nothing to contradict this release," MCD contends that the TAC should be dismissed in full.  [*Id.*].

The language that MCD refers to is found in the Attachment to the Modification called "Release of Liens," and it states the following in relevant part:

> **Waiver and Releases.**  Effective upon receipt and bank clearance of the payment described above, the undersigned hereby waives and releases in favor of M.C. DEAN, Inc. and its sureties, the higher tier contractor, if any, the owner of the Project and its lenders and guarantors, the, and their successors and assigns (the "Released Parties"), all rights that presently exist by reason of construction work performed for the Project through the Effective Date, . . . (ii) to assert or bring any causes of action, claims, suits and demands for payment for work performed through the Effective Date, including, but not limited to, claims for payment under municipal, State or Federal laws . . . .

6

[Doc. 47-2 at 12]; *see also* [Doc. 49 at 4].

The Parties make various arguments regarding the enforceability of this release, including whether it is incorporated into the Modification, whether HPM actually and intentionally released its claims against MCD, and whether HPM signed the Modification under economic duress. *See* [Doc. 49 at 5–8; Doc. 50 at 5–8; Doc. 47 at ¶¶ 45–47, 70]. The Court does not need to reach these arguments because even if the release was a part of the Modification and knowingly agreed to by the Parties, it does not bar HPM's claims. The release states, at most, that HPM "waives and releases . . . all rights that presently exist by reason of construction work *performed for the Project through the Effective Date* . . . to assert or bring any causes of action, claims, suits and demands for payment for *work performed through the Effective Date*." [Doc. 47-2 at 12 (emphasis added)].

The Effective Date of the Modification is June 16, 2023. [*Id.* at 4, 15]. The TAC does not allege that all the work covered by the Modification was performed by June 16, 2023, and MCD does not argue that it does. Indeed, the TAC alleges the opposite—that MCD's design changes "delayed HPM's ability" to work on the Project, and that HPM needed to sign the Modification and receive at least some payment "to continue its work on the Project." [Doc. 47 at ¶¶ 24, 41]; *see also* [Doc. 49 at 12 (MCD acknowledging that the Modification "provided increased *budget and time to finish* the Project" (emphasis added))]. And HPM estimated that the design changes would cause a 331-day delay in completion of the Project, *see* [Doc. 47 at ¶ 27; Doc. 47-2 at 9], but the time between MCD finalizing the design changes and directing HPM to "proceed with field layout and excavation" and the Modification's Effective Date was less than five months, *see* [Doc. 47

7

at ¶ 25]. The face of the TAC contradicts the proposition that the work covered by the Modification—and at issue in the case—was complete by June 16, 2023.

Without any allegations regarding which portion of HPM's work, if any, was completed prior to the Modification going into effect, the Court is not persuaded that "[HPM]'s allegations, taken as true, plainly demonstrate the preclusive effect of waiver as a matter of law." *See Statebridge Co. v. Martin-Powell, LLC*, No. 18-cv-02279-KLM, 2019 WL 2866692, at *9 (D. Colo. July 3, 2019). Accordingly, the Motion is respectfully **DENIED** to the extent that it seeks dismissal with prejudice of HPM's TAC based on the affirmative defense of waiver.

## II.     Count I:  Breach of Contract

A claim for breach of contract under Colorado law[1] requires proof of the following elements:  (1) the existence of a contract, (2) the performance by the plaintiff or some justification for nonperformance, (3) failure to perform the contract by the defendant, and (4) resulting damages to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

HPM asserts four theories of breach of contract in its TAC:  that MCD breached its duties under the Subcontract when it failed to (a) compensate HPM for additional expenses incurred as a result of design changes, in violation of Subcontract §§ 6.6, 6.7, and 22.0; (b) compensate HPM for $100,000 of HPM's builder's risk insurance claim, in

---

[1] The Parties agree that Colorado law applies to claims pursuant to the Subcontract. *See generally* [Doc. 49 (applying Colorado law); Doc. 50 (applying Colorado law)]; *see also* [Doc. 47-1 at § 6.9 ("This Subcontract shall be governed by and construed in accordance with the laws of the state in which the Project is located.")]. Because the Parties agree that Colorado law applies, the Court proceeds accordingly. *See Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

8

violation of Subcontract § 7.0; (c) include HPM in direct discussions with the Government related to the Modification, in violation of Subcontract § 1.0; and (d) approve HPM's change orders / requests for equitable adjustment, in violation of Subcontract §§ 6.6, 6.7, 22.0. [Doc. 47 at ¶ 69]. MCD moves to dismiss HPM's breach of contract claim related to theories (a), (b), and (d), arguing that HPM fails to allege the "failure to perform" element of the claim. [Doc. 49 at 9]. The Court addresses each theory in turn.

### A.   (a) and (d):  Compensation for Additional Expenses.

HPM alleges that MCD breached its contract obligations pursuant to Subcontract §§ 6.6, 6.7, and 22.0 when it failed to compensate HPM for additional expenses it incurred as a result of MCD's design changes and failed to approve HPM's requests for equitable adjustment. [Doc. 47 at ¶ 69(a), (d)]. Section 6.6 of the Subcontract requires that if MCD makes any design change that "causes a material increase or decrease in the estimated cost of, or the time required for the performance of any part of the work under this Subcontract, MCD shall make an equitable adjustment in the estimated cost, delivery schedule, or amount of any fixed fee and shall modify the Subcontract." [Doc. 47-1 at § 6.6]. Section 22.0 of the Subcontract states that "[i]n the event Subcontractor's performance of the Work is delayed by the acts or omissions of MCD or those for whom MCD is responsible[.] Subcontractor may request a Change Order equitably adjusting the Subcontract term and the Firm Fixed Price." [*Id.* at § 22.0]. In the case that there is a dispute as to the equitable adjustment pursuant to either Section 6.6 or 22.0, the Subcontract refers the Parties to Section 6.7. [*Id.*; *id.* at § 6.6]. Under Section 6.7, "[t]he Parties agree to negotiate to resolve any dispute arising out of the performance of this

9

Subcontract" and "agree to negotiate in good faith to reach a mutually agreeable settlement within a reasonable amount of time." [*Id.* at § 6.7].

MCD makes two arguments for why HPM's claim of breach of contract under Sections 6.6, 6.7, and 22.0 must be dismissed. First, MCD argues that the Subcontract did not require MCD to compensate HPM for additional expenses or approve the change orders presented by HPM. [Doc. 49 at 9–11]. Instead, the Subcontract's only requirement is that "MCD . . . make an equitable adjustment in certain instances," and the TAC "pleads *no facts* illustrating that MCD failed to make an equitable adjustment." [*Id.*]. Second, MCD argues that while the TAC alleges repeatedly that MCD acted "unreasonably" in denying HPM's proposed change orders, the TAC does not explain how MCD did so and "is devoid of any facts illustrating that MCD engaged in bad faith negotiations." [*Id.* at 11–12].

**"Equitable adjustment."**  In its opposition, HPM cites Black's Law Dictionary's definition of the term "equitable"—"[j]ust; conformable to principles of justice and right"—and argues that under such a definition, "there is nothing 'equitable' at all about the adjustment [MCD] forced upon HPM." [Doc. 50 at 10]. As support for this argument, HPM refers to the TAC's allegation that MCD paid HPM only 23% of its requested costs and a bit more than one third of its requested additional time. [*Id.* (citing Doc. 47 at ¶ 34)].

This single allegation is plainly insufficient. By HPM's own argument, the TAC simply alleges the existence of a gap between what HPM demanded in the R10 Proposal and what MCD proposed in the Modification. Yet, HPM asks the Court to infer from this gap alone that the Modification was inequitable—without any additional allegations in the TAC to support this inference. The TAC does not explain, for instance, why the amounts

10

requested by HPM in the R10 Proposal are themselves reasonable, or that the Modification excluded legitimate costs that are typically reimbursed in the subcontractor context. Nor does the TAC allege any standard against which the Court can evaluate whether the Modification's reduction was equitable or not.

The language of the Subcontract further supports the Court's conclusion. Section 6.6 of the Subcontract only states that if a design change "causes a material increase . . . in the estimated cost of, or the time required for the performance of any part of the work under this Subcontract, MCD shall make an equitable adjustment . . . and shall modify the Subcontract." [Doc. 47-1 at § 6.6]. It does not require MCD to adopt, without revision, HPM's change orders. Indeed, Section 6.6 itself anticipates that the Parties may not be aligned as to what the adjustment should be. *See* [*id.* ("Failure to agree to any adjustment shall be a dispute under the Disputes clause of this Subcontract.")]. To read Section 6.6 as requiring MCD to make an "equitable adjustment" equal to HPM's requested adjustment would render most of this section superfluous, an interpretation that "should be avoided." *See In re Est. of Gattis*, 318 P.3d 549, 558 (Colo. App. 2013) ("When interpreting a contract, any construction that would render any clause or provision unnecessary, contradictory, or insignificant should be avoided." (cleaned up)).

**Good faith negotiation.** In response to MCD's argument that the TAC "is devoid of any facts illustrating that MCD engaged in bad faith negotiations," [Doc. 49 at 11–12], HPM points to numerous allegations in the TAC on that point, such as MCD excluding HPM from discussions with the Government regarding the R10 Proposal and MCD refusing to explain the significant adjustments that it made to the R10 Proposal, [Doc. 50 at 10–11 (citing Doc. 47 at ¶¶ 35, 37, 39, 48)]. MCD replies that HPM's briefing

11

contradicts its allegations and does not change the fact that the TAC does not allege how MCD negotiated in bad faith in violation of Subcontract § 6.7.  [*Id.* at 6].

The Court respectfully disagrees with MCD and finds that the TAC's allegations are sufficient at this stage to state a claim for breach of the agreement to negotiate in good faith pursuant to Subcontract § 6.7.  Section 6.7 requires that the Parties "negotiate in good faith to reach a mutually agreeable settlement within a reasonable amount of time." [Doc. 47-1 at § 6.7].  The TAC alleges that MCD acted contrary to this provision—threatening HPM that it would not receive even the reduced compensation authorized by the Government "unless and until HPM approved the Modification via the Portal," which by design could not be modified by HPM.  *See* [Doc. 47 at ¶¶ 37, 39].  And there is nothing in the TAC to suggest that MCD entertained any of HPM's arguments regarding increasing the Modification compensation or that MCD proposed any settlements. Between these allegations and the allegation that MCD has continued to refuse to explain its reasoning in unilaterally reducing and changing HPM's R10 Proposal, [*id.* at ¶¶ 35, 48], the Court finds that the TAC adequately pleads that MCD negotiated the dispute regarding the R10 Proposal in bad faith.

Accordingly, the Court respectfully **GRANTS** the Motion to Dismiss as to the breach of contract claim insofar as it is based on the theory that MCD was required and failed to approve HPM's change orders / requests for equitable adjustment.  And the Court respectfully **DENIES** the Motion to Dismiss insofar as it is based on the theory that MCD engaged in bad faith negotiations, in violation of Subcontract §§ 6.6, 6.7, and 22.0.

### B. (b): Builder's Risk Insurance Deductible.

Pursuant to Section 7 of the Subcontract, titled "Required Insurance," HPM agreed to purchase specific insurance coverage for the Project. [Doc. 47-1 at § 7.0]. That same provision of the Subcontract also states that "MCD will have a builders risk policy for [the Prime Contract]." [*Id.*]. This builder's risk policy was purchased entirely by MCD, and HPM had no knowledge of its policy terms. [Doc. 47 at ¶¶ 51–52, 54]. This policy includes a $100,000 per occurrence deductible, and HPM alleges in its TAC that "MCD is responsible for paying any deductibles incurred under the builder's risk policy." [*Id.* at ¶¶ 55–56]. Thus, when an area of the Project site flooded in April of 2023, and HPM was forced to perform repairs at significant expense, HPM expected to recover its repair costs in full. *See* [*id.* at ¶¶ 57–62]. But that is not what happened. HPM submitted a claim under the builder's risk insurance policy held by MCD, and the insurer paid HPM's claim in full less the $100,000 deductible. [*Id.* at ¶¶ 59, 61]. HPM then "repeated[ly] demand[ed]" that MCD pay the remaining $100,000 of HPM's claim, but MCD has refused. [*Id.* at ¶ 62].

MCD claims that Section 7.0 of the Subcontract is "clear that MCD has no obligation to HPM on any of the insurance policies required under the Section, including its own builder's risk policy." [Doc. 49 at 12]. Section 7.0 states in relevant part that "[a]ny self-insured retentions, deductibles and exclusions in coverage in the policies required under this Section shall be assumed by, for the account of, and at the sole risk of Subcontractor." [Doc. 47-1 at § 7.0]. MCD argues that because its builders risk policy "was a 'policy required under' and directly referenced in Section 7.0," its deductible is assumed solely by HPM. *See* [Doc. 49 at 12; Doc. 51 at 7]. HPM disagrees, arguing that

13

MCD's builders risk insurance policy is not one of the "polic[ies] required" under Section 7.0.  [Doc. 50 at 11–12].

The Court respectfully agrees with HPM and finds that MCD's builders risk insurance policy is not a "polic[y] required" under Section 7.0.  Reading and viewing this Subcontract section as a whole leads to the Court's conclusion.  Section 7.0 starts out by requiring that HPM "provide MCD with a Certificate of Insurance evidencing proof of insurance for the *following types* of coverage and limits of liability."  [Doc. 47-1 at § 7.0 (emphasis added)].  Immediately following this paragraph are four indented bullet points, and each bullet point is a separate policy:  (1) a Commercial General Liability policy, (2) a Business Auto Liability policy, (3) a Commercial Umbrella policy, and (4) a Workers Compensation and Employers Liability policy.  [*Id.*].  The sentence after those four bullet points returns to standard paragraph structure and imposes additional obligations on HPM regarding "[t]he required insurance coverages *above*."  [*Id.* (emphasis added)].  The sentence after that explains that any deductibles "in coverage in the policies required under this Section shall be assumed by, for the account of, and at the sole risk of Subcontractor."  [*Id.*].  The subsequent paragraph again imposes additional terms regarding "the insurance coverage required *above*."  [*Id.* (emphasis added)].  After that sentence, there is a paragraph break that is larger than any other spacing in this Section.  [*Id.*].  This spacing is followed by one single sentence that "MCD will have a builders risk policy for [the Prime Contract] for phase 1 and 2."  [*Id.*].  This is the first and only time that Section 7.0 refers to the builder's risk policy.

The Court is unconvinced by MCD's reading that simply because the builder's risk policy is "directly referenced" in Section 7.0, it qualifies as a "polic[y] required under this

14

Section."  [Doc. 49 at 12; Doc. 51 at 7].  There is a clear difference in how Section 7.0 deals with the builder's risk insurance policy versus the other four policies.  The four policies are introduced with mandatory language, i.e. that HPM "shall" provide proof of insurance for those policies, in an indented bullet-point list and are followed by numerous obligations referencing the policies required "above."  Meanwhile, the sole reference to a builders risk insurance policy is disconnected from that discussion.  It is in a single sentence at the end of the Section, set apart by a large paragraph break.  And it only states that MCD "will" have such a policy, rather than setting out specific requirements that HPM must fulfill like with the other four policies.  Indeed, there is no requirement under Section 7.0 that *HPM* obtain a builder's risk policy at all.  *See* [Doc. 50 at 12].  The Court thus finds that the phrase "policies required under this Section" refers to the four bullet-pointed policies that HPM is required to obtain and excludes MCD's builder's risk policy.

MCD makes no other arguments explaining why HPM would be responsible for paying the insurance deductibles of MCD's own insurance policy.  The Court therefore finds that the TAC plausibly alleges that HPM was not responsible for the deductible of the builders risk policy and that MCD breached the Subcontract when it refused to compensate HPM for $100,000 of its repair costs.  The Court respectfully **DENIES** the Motion to Dismiss HPM's breach of contract claim under this theory.

### III.     Count II:  Breach of the Covenant of Good Faith and Fair Dealing

"A covenant of good faith and fair dealing is implied in every contract."  *First Am. Mortg., Inc. v. First Home Builders of Fla.*, No. 10-cv-00824-RBJ-MEH, 2011 WL 4963924, at *7 (D. Colo. Oct. 14, 2011) (citing *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 499

15

(Colo. 1995)). This covenant applies when one party to the contract "has discretionary authority with respect to an express term of the contract," and dictates that "[t]he discretion cannot be exercised in a manner that defeats the reasonable expectations of the parties to the contract." *Id.* (citing *Amoco Oil*, 908 P.2d at 498–99; *see also City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006) ("The good faith performance doctrine attaches to contracts 'to effectuate the intentions of the parties or to honor their reasonable expectations.'" (quoting *Amoco Oil*, 908 P.2d at 498)). The covenant is breached "when a party uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract." *ADT Sec. Servs., Inc. v. Premier Home Prot., Inc.*, 181 P.3d 288, 293 (Colo. App. 2007).

HPM alleges that MCD's denial of proposed change orders without justification "breached the implied covenant of good faith and fair dealing and constitutes a material breach of the Subcontract." [Doc. 47 at ¶ 79]. MCD moves to dismiss this claim because the TAC does not allege that MCD "act[ed] dishonestly or . . . outside the scope of accepted commercial practices to deprive the other party of the benefit of the contract." [Doc. 49 at 13–14 (quoting *O'Reilly v. Physicians Mut. Ins. Co.*, 992 P.2d 644, 646 (Colo. 1999))]. MCD does not argue the question of whether it has discretionary authority regarding Subcontract modifications.

HPM agrees with MCD as to the proper pleading standard but counters that HPM is not required "to recite the elements of a claim based on case law drummed up by [MCD]'s counsel." [Doc. 50 at 12–13]. HPM further argues that MCD "ignores the vast majority of the facts pled in the [TAC]"; according to HPM, its allegations that MCD breached specific provisions of the Subcontract, namely the "express good faith

16

requirements" and the requirement "to include HPM in discussions with the Government related to changes to HPM's Subcontract," are sufficient to allege that MCD acted "dishonestly or outside the accepted commercial practices." [*Id.* at 12–14].

In its Reply, MCD acknowledges that the TAC "alleges a laundry list of grievances" but contends that "HPM fails to connect the dots to show that MCD's actions deviated from commercially accepted practices." [Doc. 51 at 7]. MCD argues that "the TAC is devoid of any allegations regarding commercially accepted practices," and any efforts by HPM's opposition brief to identify those cannot fix the TAC's facial deficiency. [*Id.* at 8]. MCD does not make any specific arguments as to whether the TAC alleges that MCD acted "dishonestly."

The Court respectfully agrees with HPM that the TAC states a plausible claim for breach of the implied covenant of good faith and fair dealing. The implied covenant required MCD to "effectuate the intentions of the parties or to honor their reasonable expectations." *Amoco Oil*, 908 P.2d at 498. The Parties explicitly contracted that they would negotiate in good faith, that MCD would include HPM in direct discussion with the Government regarding any change order disputes, and that MCD will make "equitable adjustment[s]" to the Subcontract if any design changes caused a material increase in HPM's estimated costs. [Doc. 47 at ¶¶ 16–20, 75–76; Doc. 47-1 at §§ 1.0, 6.6, 6.7]. Accordingly, HPM had a "reasonable expectation[]" that MCD would act in accordance with those contractual provisions. MCD did not. Instead, HPM alleges that MCD met with the Government to discuss HPM's change order without HPM's knowledge; prepared a Modification significantly less than HPM's proposal; refused to explain the reduction to HPM; and threatened to not pay HPM any of the money that the Government had

17

approved unless HPM signed the Modification as prepared by MCD.  *See* [Doc. 47 at ¶¶ 32, 37–39; Doc. 47-3 at 2–3].  Drawing all inferences in favor of HPM, these allegations plausibly state that MCD acted dishonestly and did not honor HPM's reasonable expectations.  The Court thus finds that HPM has sufficiently stated a claim for breach of the implied covenant, and respectfully **DENIES** the Motion to the extent it seeks to dismiss this claim.

## IV.     Leave to Amend

At the end of its opposition to the Motion to Dismiss, HPM requests leave to amend "[i]n the event the Court identifies a factual deficiency" with the TAC.  [Doc. 50 at 14].[2] Whether to permit amendment is within the Court's discretion.  *Openwater Safety IV, LLC v. Great Lakes Ins. SE*, 435 F. Supp. 3d 1142, 1151 (D. Colo. 2020).  "A court may deny leave to amend in the absence of a formal motion requesting leave to amend, because a 'bare request to amend in response to a motion to dismiss' does not alert the court or opposing party of the request to amend or the basis for it."  *Ubel v. Progressive Direct Ins. Co.*, No. 20-cv-00204-RM-NYW, 2020 WL 9432929, at *23 (D. Colo. Oct. 22, 2020) (quoting *Johnson v. Spencer*, 950 F.3d 680, 721 (10th Cir. 2020)), *recommendation adopted*, 2020 WL 6701102 (D. Colo. Nov. 13, 2020).  Here, HPM's request for leave to amend is hypothetical and does not articulate any specific proposed amendments.  Thus, any request by HPM to amend the TAC should be made by formal motion, in compliance with D.C.COLO.LCivR 15.1, and after conferring with MCD.

---

[2] MCD opposes this request based on its waiver argument, *see* [Doc. 51 at 8], which the Court respectfully rejected in this Order.

## CONCLUSION

For the foregoing reasons, it is **ORDERED** that:

(1) Defendant M.C. Dean, Inc.'s Motion to Dismiss [Doc. 49] is **GRANTED in part** and **DENIED in part**;

(2) Count I is **DISMISSED without prejudice** insofar as it is predicated on MCD's alleged failure to approve various proposed change orders / requests for equitable adjustment submitted by HPM, in violation of the Subcontract §§ 6.6, 6.7, and 22.0;

(3) Count I **SURVIVES** insofar as it is predicated on MCD's failure to negotiate the dispute related to the R10 Proposal in good faith, in violation of the Subcontract §§ 6.6, 6.7, and 22.0;

(4) Count I **SURVIVES** insofar as it is predicated on MCD's failure to include HPM in direct discussion with the Government related to the R10 Proposal, in violation of the Subcontract § 1.0; and

(5) Count II **SURVIVES**.

DATED: March 5, 2026

BY THE COURT:

Nina Y. Wang
United States District Judge